IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOANNA JOHNSON-HARRIS,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>AMQUIP CRANES RENTAL, LLC and<br>TOM JANEKA,<br>　　　　　Defendants. | CIVIL ACTION<br><br>NO. 14-767 |

**OPINION**

I.   **INTRODUCTION**

Plaintiff Joanna Johnson-Harris is an African American woman who is a member of the International Union of Operating Engineers, Local 542 ("IUOE Local 542"). Plaintiff's claims in this action arise out her work for Defendant AmQuip Cranes Rental, LLC ("AmQuip") from October 2010 to July 2011 at the PBF Energy Delaware City Refinery ("PBF Refinery" or the "Refinery") where she was supervised by Defendant Tom Janeka. She claims that she was subjected to a racially hostile work environment and was discriminated against because of her race. Her claims for intentional racial discrimination (Count I) and retaliation (Count II) are each brought under 42 U.S.C. § 1981. Before the Court is AmQuip and Janeka's (collectively, the "Defendants") Motion for Summary Judgment which seeks to dismiss each of those claims. For the reasons that follow, the motion will be granted.

II.  **BACKGROUND**

　　A.   *Undisputed Facts*

Beginning in 2001, Plaintiff was an apprentice in IUOE Local 542's apprenticeship program. *See* Mot. Ex. B. ("Pl.'s Dep.") at 44:11-19. Initially she was assigned to work as an oiler on a crane at the PBF Refinery. *Id.* at 43:18-44:6, 51:8-11. In 2005, upon completion of

the apprenticeship program, she became a journeywoman–operating engineer and was assigned by IUOE Local 542 to work at the Refinery for a few weeks as a freight elevator operator. *Id.* at 51:14-52:19.

In 2010, Plaintiff was again assigned to work at the Refinery. *Id.* at 56:15-19. According to Plaintiff, the assignment was made at the request of Bob Heenan, IUOE Local 542's President, because of alleged reports of a "lack of diversity" on the maintenance crew that previously worked at the Refinery and alleged complaints by operating engineers of past discriminatory practices. *Id.* at 56:20-57:5, 59:23-60:8. Plaintiff further testified that the Civil Rights Committee of IOUE Local 542, of which she is a member, deemed it "necessary to begin to integrate the workforce at the refinery" in connection with the re-opening of the Refinery in 2010. *Id.* at 57:15-20, 63:7-9.

In June 2010, she was hired to work by a company in the name of Brand Scaffold to operate a forklift. *Id.* at 350:8-18. She performed that job until she was laid off in October 2010 but that same month was assigned by IUOE Local 542 to work for AmQuip[1] again at the Refinery, this time as an elevator/hoist operator on the night shift. *Id.* at 372:15-22, 137:14-138:5; *see also* Mot Exs. C & D. She held that position until July 2011. *See* Mot. Ex. D. It is events that took place during her time at this job—as an elevator/hoist operator for AmQuip—that form the basis of this lawsuit.

      **B.**    *Operative Facts*

            **1.**    **November 2010 Incidents**

Johnson-Harris testified that she had several offensive encounters with Charles Long, a boilermaker worker at the Refinery who was not an AmQuip employee, during early November 2010. *See* Mot. Ex. G. On one occasion, Long entered the hoist and asked Johnson-Harris, "Who

---

[1] AmQuip had entered into several subcontracts with Nooter Construction Co. ("Nooter"), previously a defendant in this case, to provide operating engineers to operate the machinery at the Refinery.

let you back in?", to which she replied, "[D]oesn't matter.  I'm here.  Where you going?"  *Id.*  Long asked her if she had ever been stuck on the hoist, and Johnson-Harris answered that she had not been stuck on this particular one.  *Id.*  Long then continued, "I was with the day operator who got all scared and angry and it was the two of us.  I wasn't scared about the hoist but I was scared because of the big black man on here being angry."  *Id.*  Johnson-Harris replied, "[D]on't get started with that stuff."  *Id.*

Johnson-Harris stated that, later, while alone on the hoist, Long attempted to push a cart into her because she did not move out of his way quickly enough.  Pl.'s Dep. at 146:23-148:14.  The next day, after lunch, Johnson-Harris returned to the hoist to find her personal belongings that she had left inside the hoist (her coat, a book, *etc.*) soaked with water.  *Id.* at 207:8-208:21.  Johnson-Harris notified Preston Penick, the night shift superintendent, of the incidents involving the cart and her belongings.  *Id.* at 173:15-174:23.

As she was leaving the site that night after her shift, at around 3:50 a.m., Long and two others, later identified as Larry Sterling and Chris Barker, followed her into the parking lot.  *See id.* at 175:25-19; Mot. Ex. H.  Long asked, "Where did [you] go?"  Mot. Ex. G.  Johnson-Harris replied that the hoist stops at 3:30 a.m.  *Id.*  She testified that Long "said . . . something to the effect of, ['Y]ou don't need to bring your black ass back down here anymore.[']"  Pl.'s Dep. at 176:2-4.  She states she then began running toward her car "because [she] feared for her life," got in her car, and drove home.  *Id.* at 176:5-13.

When she reported to work the next day, Janeka and her IUOE Local 542 Business Agent (Janeka's brother, Ted), approached her about a complaint made against her regarding her operation of the elevator the previous night.  *See id.* at 186:14-187:6.  Johnson-Harris responded by complaining about the events on the elevator involving Long and her clothes being soaked.  *Id.* at

188:3-18.  Janeka, the Business Agent, and Johnson-Harris's IUOE Local 542 Shop Steward immediately took her to AmQuip's trailer and had her complete a formal incident report regarding the events she alleged took place the previous night involving her clothes, Long, and the other boilermakers.  *See id.* at 189:11-192:10; *see also* Mot. Ex. G.  Notably, her handwritten report included the incident where Long followed her to the parking lot, but mentioned only him saying "Where did you go?", not "You don't need to bring your black ass down here anymore."  *See* Pl.'s Dep. at 202:8-204:24.  It also did not make mention of any of the other events that she complains here took place in the week before that incident.  *See id.* at 208:24-210:18, 201:18-202:7.

After she completed her statement, Johnson-Harris was informed by Janeka, the Business Agent, the Shop Steward, and two unidentified employees of Nooter that an immediate investigation would be conducted into the matter.  *Id.* at 211:18-22.  Within a few days, the investigation was completed and Johnson-Harris was informed of the results in a meeting, as confirmed in a memorandum prepared by Nooter.  *Id.* at 213:4-214:18; *see also* Mot. Ex. H.  Johnson-Harris testified that she was told steps were being taken to remediate the situation, which included Long and the other boilermaker workers involved in the incident being coached on sensitivity and professional etiquette while on the job site.  Pl.'s Dep. at 218:8-21.  The conclusion reached by the investigation was that Long made poor word choices but that his words were not found to be threatening, racial, or malicious.  Mot. Ex. H.  Johnson-Harris admitted that she understood their perception of the events, but she stated she believed she was harassed.  *Id.*  She was asked, "What could we do to make you feel more comfortable on the jobsite?", to which she replied that she did not want special treatment, only to be treated fairly.  *Id.*  During Long's sensitivity coaching, he was told that retaliation against Johnson-Harris would not be tolerated.  *Id.*

4

Johnson-Harris testified that AmQuip's Vice President of Operations, Michael Goode, and the shop steward separately asked her after that meeting if there was anything they could do to make her more comfortable working at the Refinery and offered her a position working on the day shift as a forklift operator, while still paying her the higher wage rate for the night shift. Pl.'s Dep. at 214:3-215:10, 218:22-219:8, 138:25-139:15.  She states that Goode told her, "I want to put you on the day shift because I don't feel that you're safe here.  I believe something has happened.  I know that it's not always easy working down here in Delaware."  *Id.* at 215:3-7.  She testified she had no preference working the elevator or a forklift and accepted the offer to work the day shift; she did not view the transfer as any form of punishment and felt Goode was helping her out with a "win-win" resolution of the incident for both her and AmQuip.  *Id.* at 220:3-17, 222:4-223:6, 378:3-11.

Johnson-Harris admitted that she did not make any complaint to anyone at AmQuip regarding any alleged racial discrimination, harassment, hostile work environment, workplace conduct, retaliation, or anything else at any time while she worked for AmQuip at the PBF Refinery after the resolution of this incident.  *Id.* at 223:17-228:14, 228:15-25, 416:14-20.

### 2.     Alleged Discriminatory Comments

After her transfer to the day shift, Johnson-Harris testified that someone called her "that black bitch" at least once a month, but she could not identify anyone who said it or any specific dates when it happened.  *Id.* at 129:16-21, 135:13-24.  She did not complain to anyone at AmQuip or Nooter about these incidents.  *Id.* at 136:9-137:8.  She also testified that she heard workers use the "n-word" at the Refinery, but she could not identify anyone who said it specifically.  *Id.* at 423:15-426:21.  Furthermore, she claims that, prior to the elevator incident, workers at the Refinery made unspecified comments which she felt were "offensive in overtone,

5

offensive in respect" and that the "manner in which [workers] would assist me or not assist me was pretextual and hostile," and that such comments and conduct was racially discriminatory "because I am a black female." *Id.* at 406:23-108:20.

The only specific instance that Johnson-Harris identifies in which a Refinery worker called her "that black bitch" when she worked for AmQuip was in April 2011 when she was in the changing room and overheard another worker say, "I don't know why she left this forklift here. I'll be glad when they get rid of this black bitch." *Id.* at 130:2-20. She did not know the identity of the worker who made the comment, but confronted him directly about his comments and had some "heated words with him." *Id.* at 130:20-131:16. That said, she did not complain about this incident to AmQuip or Nooter. *Id.* at 135:25-136:8.

### 3. 2010–11 Holiday Season Layoff

Johnson-Harris testified that she took a sick leave in December 2010 around the Christmas and New Year's holidays, during which the Refinery was closed on some days and only had a skeleton crew while no work was being performed. *Id.* at 397:11-400:5; *see also* Mot. Ex. D. She testified that Janeka called her while she was on sick leave and told her she was being laid off. Pl.'s Dep. at 395:21-396:3. However, she was shortly reassigned to her position working for AmQuip at the Refinery and resumed working on January 3, 2011, as soon as she was cleared to return to work from her sick leave by her physician, without suffering any loss of work or income. *Id.* at 468:2-469:6.

### 4. July 2011 Layoff and Failure to Rehire

AmQuip provided equipment and operating engineers at the Refinery during all times relevant to this lawsuit under the terms of its successive subcontracts with Nooter. *See* Mot Exs. I-J. In June 2011, Nooter issued Amendment No. 1 to AmQuip's subcontract in place at that

6

time, which added a requirement that all operating engineers AmQuip employed to work at the PBF Refinery must have a national crane certification as a Certified Crane Operator ("CCO"). *See* Mot. Ex. K. In October 2011, Nooter issued Amendment No. 2 to AmQuip's subcontract in place at that time, which added the requirement that all operating engineers AmQuip employed to work at the Refinery must be CCO certified "and have the Large Crane Certification, Small Crane Certification, and the Forklift Certification." *See* Mot. Ex. L.[2]

On July 7, 2011, after returning from a vacation, Johnson-Harris saw a posting in AmQuip's job trailer which gave notice regarding the CCO requirement, mandating certification by August 1, 2011. Pl.'s Dep. at 88:11-89:20, 96:17-20, 344:18-345:20. Johnson-Harris testified that she had the right, under "union policy" in the IUOE Local 542 collective bargaining agreement, to request a replacement for her position for up to 90 days and later be assigned to that job, and, given her understanding, she told Janeka on July 27, 2011, that she was leaving her position with AmQuip to go obtain her CCO. *See id.* at 93:22-94:3, 231:7-232:25; *see also* Am. Compl. ¶¶ 39-40.

Johnson-Harris claims that she obtained her CCO in October 2011 and that when she sought to be reassigned in October 2011, AmQuip and Janeka denied her reassignment. Am. Compl. ¶¶ 41-42.

### 5. Plaintiff's "Sense" that Janeka Was Racist

Even though Janeka never made racially offensive comments or statements to Johnson-Harris, she testified that she believed Janeka was racist:

Q. How do you know he's a racist?
A. How do I know he's racist?

---

[2] Johnson-Harris contends that this requirement, while facially neutral, in actuality affected only her. *See* Pl.'s Dep. at 97:8-99:9. Regardless of the veracity of this contention, there is no issue regarding the fact that this requirement was imposed by Nooter (which is no longer a defendant in this case), not AmQuip or Janeka. *See* Mot. Exs. I-K.

> Q. Yes.
>
> A. Because my dealings with Mr. Janeka for the year and a half that I was there, from the first beginning when I came into the refinery, was not one that I was happy to be there.
>
> Q. He wasn't happy to see you?
>
> A. He was not happy to see me.
>
> Q. How do you know he just wasn't a moody person and treated everybody like that?
>
> A. I'm going to tell you about my personal dealings with Mr. Janeka. And those are the ones which I can speak of.
>
> Q. Why don't you answer my question, please?
>
> A. I don't know what your question is. Your question is about other people. I don't know what other people you mean.
>
> Q. So you said you could tell by the way that he treated you that he was a racist?
>
> A. As an African-American female, I can detect that. I've been one for 49 years.
>
> Q. So it's sort of like a radar thing; is that right?
>
> A. Yeah, pretty much you kind of know.

Pl.'s Dep. at 108:22-110:14.

### C. *Procedural History*

Johnson-Harris first contacted the EEOC on November 30, 2011, about alleged discrimination in connection with her employment at the Refinery. *See* Mot. Exs. E & F. She filed identical Charges of Discrimination against AmQuip and Nooter on August 22, 2012. *Id.*

She filed her initial Complaint on February 4, 2014. *See* Compl. In her Complaint, she asserted nine counts of alleged discrimination against AmQuip, Nooter, and Janeka based upon race and sex under Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act, and 42 U.S.C. § 1981. *Id.* On April 14, 2014, AmQuip, Nooter, and Janeka moved for the dismissal of Johnson-Harris's Title VII and PHRA claims based on a failure to exhaust administrative remedies and untimeliness in connection with the timing and nature of the Charges

of Discrimination filed with the EEOC.  *See* ECF Nos. 9 & 10.  Johnson-Harris stipulated to the dismissal of her Title VII and PHRA claims in response to the motions.  *See* ECF Nos. 11 & 12.

Johnson-Harris filed an Amended Complaint on July 3, 2014, in which she asserted claims for discrimination and retaliation on the basis of race under 42 U.S.C. § 1981 against AmQuip, Nooter, and Janeka.  *See* Am. Compl.  AmQuip and Janeka together, and Nooter separately, filed motions for summary judgment on December 15, 2014.  *See* ECF Nos. 39 & 40.  After several stays in the litigation, entered due to health and other issues, Johnson-Harris responded to the AmQuip and Janeka's motion on May 15, 2015.  ECF No. 56.  In the interim, on May 4, 2015, the Court agreed to the parties' stipulation to dismiss Nooter as a defendant.  ECF No. 53.  AmQuip and Janeka filed their reply on May 27, 2015.  ECF No. 57.  In response to this Court's order of June 17, 2015, Johnson-Harris filed her response to AmQuip and Janeka's original Statement of Undisputed Facts on June 25, 2015.  *See* ECF Nos. 59 & 60.  The motion is now ripe for consideration.

### III. LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Alabama v. North Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."

*Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  A fact is material if it might affect the outcome of the suit under the governing law.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'"  *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (alteration in original) (quoting *Anderson*, 477 U.S. at 252).

**IV.   DISCUSSION**

    **A.   *Retaliation***

As an initial matter, the Defendants argue that Johnson-Harris's Section 1981 retaliation claim, based on AmQuip's alleged failure to rehire her in October 2011 after she obtained CCO certification, is barred by the two-year statute of limitations.  *See* Mot. at 22-23.  Although Johnson-Harris advances substantive arguments in opposition to the motion to dismiss her retaliation claim, she makes no argument regarding the statute of limitations.  Given that omission, she has waived any opposition.  But even if that were not so, her retaliation claim would still be barred by the statute of limitations.

Section 1981 contains no express statute of limitations.  *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987).  In *Goodman*, the Supreme Court instructed federal courts to apply "the most appropriate or analogous state statute of limitations" to claims based on violations of Section 1981 and held that the Third Circuit was correct in selecting Pennsylvania's two-year

statute of limitations period for personal injury actions to apply to actions under Section 1981. *Id.* at 660, 662.  On December 1, 1990, however, Congress enacted a federal catchall four-year statute of limitations for any "civil action arising under an Act of Congress enacted after the date of the enactment of this section."  28 U.S.C. § 1658.  In *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004), the Supreme Court held that "a cause of action 'arises under an Act of Congress enacted' after December 1, 1990—and is therefore governed by § 1658's 4-year statute of limitations—if the plaintiff's claim against the defendant was made possible by a post-1990 enactment."  *Id.* at 382.  Because Section 1981 was amended by Congress in the Civil Rights Act of 1991, actions under the section which were made possible by the Act are subject to Section 1658's four-year statute of limitations.  But claims which would have been actionable under the pre-1991 version of Section 1981 "are still subject to *Goodman*[]'s application of Pennsylvania's two-year state statute of limitations period."  *Smith-Cook v. Nat'l R.R. Passenger Corp. (AMTRAK)*, No. 05-0880, 2005 WL 3021101, at *7 (E.D. Pa. Nov. 10, 2005).

The question thus becomes whether Johnson-Harris's retaliation claim could have been brought prior to the 1991 amendment to Section 1981.  Before 1991, Section 1981 protected the right of individuals to make and enforce contracts.  *Brennen v. Rutgers State Univ.*, 941 F.2d 154, 169 (3d Cir. 1991).  It prohibited, *inter alia*, "when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms."  *Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989).  Because a claim based on failure to hire (or, in this case, rehire) asserts a failure to enter into a contract with a plaintiff, courts have routinely held that failure-to-hire claims would have been actionable under the pre-1991 version of Section 1981.  *See, e.g.*, *Pintor v. Port. Auth.*, No. 08-2138, 2009 WL 2595664, at *2 (D.N.J. Aug. 20, 2009); *George v. Am. Baptist Churches USA*, No. 07-1306, 2008 WL 2265281, at *4

11

(E.D. Pa. May 30, 2008); *Vereen v. Woodland Hills Sch. Dist.*, No. 06-0462, 2008 WL 794451, at *16 n.6 (W.D. Pa. Mar. 24, 2008); *Smith-Cook*, 2005 WL 3021101, at *7; *Mahar v. City of Portland*, No. 03-1783, 2005 WL 465428, at *8 (D. Or. Feb. 28, 2005). Because Johnson-Harris's failure to rehire claim would have been actionable under the pre-1991 version of Section 1981, it is subject to *Goodman*'s application of the two-year Pennsylvania statute of limitations for personal injury actions.

Under this standard, her failure to rehire claim is barred. "A claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of an injury." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994). "In the employment context, the cause of action accrues when the adverse employment decision is made and communicated to the plaintiff." *George*, 2008 WL 2265281, at *5 (citation and internal quotation marks omitted); *see also Hanani v. State of N.J. Dep't of Envtl. Prot.*, 205 F. App'x 71, 76 (3d Cir. 2006) (holding that a plaintiff's cause of action for failure to promote accrued no later than the date that the supervisor advised her that her name had been removed from the list of individuals under consideration for the promotion). Johnson-Harris alleges that she was not rehired in October 2011 after she was laid off on July 27, 2011, "in connection with the requirement that all operators at the PBF Refinery had to have a CCO and after she allegedly obtained her CCO." Mot. at 23. However, she did not file her Complaint in this action until February 4, 2014, well beyond the two-year statute of limitations for such a claim under Section 1981. Johnson-Harris does not dispute these facts. Accordingly, the Defendants' motion for summary judgment on Johnson-Harris's retaliation claim shall be granted.

  B. *Hostile Work Environment*

The Defendants argue that Johnson-Harris cannot establish a claim for hostile work environment harassment because she is unable state a prima facie case as required under Section

1981.  *See* Mot. at 19-21.  Johnson-Harris argues that the events alleged should permit a reasonable jury to find that she has sufficiently established the existence of this claim.  *See* Opp'n at 3-9.

The standards of analysis for hostile work environment claims under Section 1981 and Title VII are identical.  *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008); *Verdin v. Weeks Marine Inc.*, 124 F. App'x 92, 96 (3d Cir. 2005); *Gilbert v. Phila. Media Holdings LLC*, 564 F. Supp. 2d 429, 439 (E.D. Pa. 2008).  Accordingly, to establish a prima facie hostile work environment claim, Johnson-Harris must establish that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

### 1. *Respondeat Superior* Liability for November 2010 Incidents

When an employee alleges harassment by a co-worker, the employer can be liable only if it actually knew or reasonably should have known of the harassment.  *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  However, of all the incidents of harassment Johnson-Harris alleges, the only ones she ascribes to a specific individual or individuals are those involving Long, Sterling, and Barker.  It is undisputed that Long, Sterling, and Barker were not employees of AmQuip, so the question for the Court becomes whether an employee can subject an employer to *respondeat superior* liability based on the actions of a nonemployee.

The Third Circuit has not addressed this question.  Accordingly, for guidance, this Court will look to other circuit courts that have held an employer liable for the harassment of its employee by a nonemployee "where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate

corrective action."**³** *Armstead v. Exec. Cleaning & Supply, Inc.*, No. 12-2452, 2014 WL 4659935, at *13 (M.D. Pa. Sept. 17, 2014) (citation and internal quotation marks omitted); *see also Pryor v. United Air Lines, Inc.*, — F.3d —, 2015 WL 3973562, at *8 (4th Cir. July 1, 2015) (reiterating its prior holding that "an employer may be held liable for hostile work environments created by co-workers and third parties if it knew or should have known about the harassment and failed to take effective action to stop it . . . *[by] respond[ing] with remedial action reasonably calculated to end the harassment*" (emphasis in original) (citation and internal quotation marks omitted)); *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005) ("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it."); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001) ("The negligence analysis can be divided into two separate inquiries, looking first into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses." (citation and internal punctuation omitted)); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997) (holding that an employer may be responsible for harassment toward employees by acts of nonemployees). "This theory of liability is grounded not in the harassing act itself . . . but rather in the employer's 'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action." *Guthrie v. Baker*, 583 F. Supp. 2d 668, 679 (W.D. Pa. 2008) (quoting *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006)).

Analyzing whether *respondeat superior* liability applies to these incidents, the Court looks to the following relevant facts: (1) Long told Johnson-Harris that he had been stuck on the hoist

---

**³** Other district courts in the Third Circuit have done the same. *See, e.g.*, *Costenbader v. Classic Design Homes, Inc.*, No. 08-2329, 2010 WL 597456 (M.D. Pa. Feb. 16, 2010); *Guthrie v. Baker*, 583 F. Supp. 2d 668 (W.D. Pa. 2008); *Graves v. County of Dauphin*, 98 F. Supp. 2d 613 (M.D. Pa. 2000); *accord Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 476 n.15 (D. Del. 2007) (collecting more than a dozen cases nationwide).

and was "scared because of the big black man on here being angry"; (2) Long attempted to push a cart into her on the hoist; (3) she found her belongings soaked with water inside the elevator; (4) she complained to the night shift supervisor about the prior two events; (5) Long, Sterling, and Barker followed her into the parking lot late after her shift, where Long said "You don't need to bring your black ass down here anymore"; (6) she told the IUOE Local 542 Business Agent about the run-ins with Long on the elevator, her clothes being soaked, and the confrontation in the parking lot; (7) she was immediately brought into a meeting with Janeka, the business agent, the shop steward, and two representatives from Nooter, where she completed a formal incident report; (8) she was told that they would conduct an investigation into her report; (9) Long and the others were interviewed by management; (10) at the close of the investigation, she was told that Long and the others would be coached on sensitivity and professional etiquette; (11) the investigation concluded that Long made poor word choices but his words were not threatening, racial, or malicious; (12) she admitted to understanding their perception of the events, but reiterated her belief that she was harassed; (13) Goode and the shop steward asked her after the meeting if there was anything they could do to make her more comfortable working at the refinery; (14) they offered her a position working on the day shift as a forklift operator, while still paying her the higher night-shift wage; (15) Goode told her, "I want to put you on the day shift because I don't feel that you're safe here. I believe something has happened. I know that it's not always easy working down here in Delaware."; (16) she testified she had no preference working the elevator or a forklift; and (17) she did not view the transfer as any form of punishment and that Goode was helping her out with a "win-win" resolution for both her and AmQuip.

  Applying these facts to the legal framework outlined above, there is no question that the Defendants knew about these incidents, given that Johnson-Harris complained about them directly to Janeka, the business agent, and the shop steward, as well as the Nooter representatives.

So the Court must look to the remedial action the Defendants took to determine whether such action was "reasonably calculated to end the harassment." *Pryor*, — F.3d at —, 2015 WL 3973562, at *8 (emphasis removed) (citation and internal quotation marks omitted).

In *Knabe v. Boury Corp.*, 114 F.3d 407 (3d Cir. 1997), the plaintiff complained to a manager about a sexually hostile work environment. *Id.* at 409. The manager interviewed the alleged harasser, the plaintiff, and three other employees about the incident. *Id.* He found the investigation inconclusive because the plaintiff's claims lacked corroboration. *Id.* Even so, the Third Circuit held that the employer's remedial action was adequate. *Id.* at 412. Here, the Defendants' investigation into the incidents and the meetings held with Long and the others were similarly adequate and, like the action taken in *Knabe*, their actions were reasonably calculated to prevent further harassment. Upon hearing of Johnson-Harris's complaints, Janeka, the business agent, and the shop steward immediately brought her into a meeting with representatives from Nooter to write an incident report; an investigation was undertaken very shortly thereafter and was concluded within a number of days. *See Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) ("[A]n employer's actions [are] adequate, as a matter of law, where management undert[akes] an investigation of the employee's complaint within a day after being notified of the harassment [and] spoke to the alleged harasser about the allegations . . . .").

Even though, under Third Circuit precedent, the Defendants' investigation alone qualifies as sufficiently adequate remediation, the Defendants went even a step further to remedy the situation in offering to transfer Johnson-Harris to the day shift while paying her a night-shift rate. Johnson-Harris agreed at her deposition that such an act "removed the potential threat caused by Long," and she volunteered that the solution was a "win-win situation." *See* Pl.'s Dep. at 222:22-223:16. Even though she testified that she stated, at the meeting concluding the

investigation, that she still felt she was harassed, "the law does not require that investigations into sexual harassment complaints be perfect. . . . only that the employer take steps reasonably likely to stop the harassment." *Knabe*, 114 F.3d at 414. The Defendants' took such steps, and their remedial actions are adequate.

### 2. *Respondeat Superior* Liability for Other Offensive Comments

Johnson-Harris contends that after being transferred to the day shift, she was (at least once a month) either overheard or was referred to as "black bitch," and she occasionally heard workers at the Refinery using the "n-word" in conversation. However, because she made no complaints to any management-level employee at AmQuip, the Defendants cannot be held to have the knowledge of harassing conduct required to establish the existence of *respondeat superior* liability.

A management-level employee must have "actual or constructive knowledge about the existence of a [racially] hostile environment" for a court to impute that knowledge to the employer. *Petril v. Cheyney Univ. of Pa.*, 789 F. Supp. 2d 574, 580 (E.D. Pa. 2011). An employer has actual knowledge of harassment when an employee utilizes a grievance procedure or otherwise informs a management-level employee who has the duty to prevent and correct harassment in explicit terms that harassment on the basis of race is occurring. *See Huston*, 568 F.3d at 107. Alternatively, an employer has constructive knowledge "where an employee provides management-level personnel with enough information to raise a probability of . . . harassment in the mind of a reasonable employer." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 1999). If an employee's complaints do not refer to offensive behavior based on race, an employer does not have constructive knowledge of harassment. *Id.* Johnson-Harris admitted at her deposition that she did not make any complaint to anyone at AmQuip regarding any alleged comments or after the November 2010 incident was resolved. *See* Pl.'s Dep. at 223:17-228:14, 228:15-25, 416:14-20.

Because she made no complaints to any AmQuip employee, let alone a management-level employee, regarding any comments made to or about her, AmQuip cannot be held to have either actual or constructive knowledge of harassment.

Considering the totality of the circumstances, the Court concludes that Johnson-Harris has failed to demonstrate the existence of *respondeat superior* liability. Accordingly, she has not satisfied a necessary element of her hostile work environment claim, and Defendants' motion for summary judgment shall be granted in this regard.

### C. *Intentional Discrimination and Disparate Treatment*

Finally, in her Amended Complaint, Johnson-Harris advances claims under Section 1981 of intentional discrimination against both AmQuip and Janeka and disparate treatment against Janeka. In their summary judgment motion, the Defendants argue that they are entitled to summary judgment on the intentional discrimination claim because Johnson-Harris fails to meet any burden required of her under the *McDonnell Douglas Corp. v. Green* burden-shifting framework. Mot. at 12-19. Further, they argue that they are entitled to summary judgment on the disparate treatment claim against Janeka because Johnson-Harris has offered no evidence to support this claim. *Id.* at 21-22.

Johnson-Harris failed to address these portions of the Defendants' motion for summary judgment in her response, choosing to address only the hostile work environment and retaliation claims. Therefore, her failure to mention the intentional discrimination and disparate treatment issues in her summary judgment response "constitutes abandonment of those claims." *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (citing *Hackett v. Cmty. Behavioral Health*, No. 03-6254, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005) (holding that a plaintiff's failure to address claims waives the opportunity to contest summary judgment on that ground)).

She is not permitted to simply rely on the allegations in her Amended Complaint to substantiate these unaddressed claims. Accordingly, the Court need not address the merits of the Defendants' arguments on these grounds, and the motion for summary judgment shall be granted as unopposed with regards to Johnson-Harris's intentional discrimination and disparate treatment claims.

An appropriate Order follows.

Dated: **July 8, 2015**

                                          **BY THE COURT:**

                                          **/S/WENDY BEETLESTONE, J.**

                                          _____

                                          **WENDY BEETLESTONE, J.**